Filed 2/10/15  In re Nathan H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re NATHAN H., a Person Coming Under the Juvenile Court Law. | D066575 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CASSANDRA L.,<br><br>    Defendant and Appellant. | (Super. Ct. No. J519001) |

APPEAL from a judgment of the Superior Court of San Diego County, Carol

Isackson, Judge.  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and

Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Cassandra L. appeals a judgment[1] declaring her minor son, Nathan H., a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivision (b),[2] removing him from her custody under section 361, subdivision (c)(1), and designating Nathan's foster parents the holders of his educational rights. Cassandra contends (1) sufficient evidence does not support the juvenile court's jurisdictional findings and dispositional order, and (2) the juvenile court abused its discretion by assigning Nathan's educational rights to his foster parents. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On May 25, 2014, the San Diego County Health and Human Services Agency (Agency) received a child welfare referral indicating Nathan, then eight years old, had been involved in a car accident and was transported to a children's hospital by paramedics. He had a small bruise on his lung and was kept overnight for observation. Cassandra initially stated Nathan had been sitting in the backseat, but Nathan corrected her and said he had been sitting in the front passenger seat, as he always did. Cassandra reported she was sleeping in the backseat of the car while a friend, Trevor, drove. Trevor drove on the wrong side of the road, hit a tree, and fled on foot. A concerned citizen called 911. When paramedics arrived, they observed the backseat did not appear to have

---

[1] In a dependency case, the disposition order is the first appealable order and constitutes the judgment in the case. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.)

[2] All further statutory references are to the Welfare and Institutions Code.

2

room for anyone to sit. A hospital social worker suspected Cassandra was under the influence of drugs based on her fidgeting, rapid speech, and inability to focus.

Cassandra and Nathan gave a social worker conflicting accounts of the events leading up to the accident. According to Cassandra, she and Nathan were at a pool and Memorial Day barbecue all day, then went to a friend's house to watch movies and eat. After falling asleep, they woke up at 5:00 a.m. to look for a hotel. (Cassandra and Nathan were homeless and often stayed with friends or at hotels.) Cassandra denied Trevor was driving under the influence. According to Nathan, Cassandra and Trevor went to a barbecue while Nathan stayed in the car with "the doors locked, it is really secure, and I was sleeping." Nathan awoke when Cassandra and Trevor returned to the car to drive to a hotel at 5:00 a.m.

The Agency received a second referral regarding Nathan. Police arrested Cassandra on June 2 for being under the influence of drugs. She exhibited signs of being under the influence and told the arresting officer she "smoked meth yesterday." She was with a man who police also arrested for being under the influence. Due to her arrest, Cassandra asked a friend, Jeff D., to pick up Nathan at school. The school did not have authorization to release Nathan to Jeff, so police took Nathan to Polinsky Children's Center (PCC).[3] Nathan tested presumptively positive for amphetamine/methamphetamine during his intake at PCC.

---

[3]     The school principal stated that although the school is always careful about who picks up students, they were "extremely careful with Nathan" because a man once tried to pick up Nathan after Cassandra had removed the man's name from the authorization list.

An Agency social worker interviewed Cassandra regarding the accident and arrest. Cassandra told the social worker she had not actually used drugs, but admitted to it only because police insisted she was under the influence. She admitted to a history of methamphetamine use, but claimed to have been sober since 1995. The social worker inquired about Cassandra's mental health, but she responded that it was confidential information. Cassandra later acknowledged a history of depression, for which she received mental health services. Cassandra explained that her prior illegal drug use may have been her way of self-medicating to address her mental health. The social worker observed, "Throughout the conversation the mother stated on several occasion[s] that she was advised not to speak to me about many things and that a lot of the things I was asking were confidential and she could not discuss them with me because she is preparing reports for investigations she is doing on several cases."

On June 4, 2014, the Agency filed a petition on behalf of Nathan, alleging he suffered, or was at substantial risk of suffering, serious physical harm or illness due to Cassandra's inability to supervise or protect him adequately. The petition referenced the accident and the Agency's suspicion that Cassandra was under the influence at the time; Nathan's presumptive positive drug test; and Cassandra's subsequent arrest. At a detention hearing the following day, the juvenile court found there was a prima facie showing on the petition, detained Nathan in out-of-home care, and ordered supervised visits for Cassandra.

---

The principal discovered Cassandra owed the man money and he intended to hold Nathan until Cassandra paid him back.

In its initial jurisdiction and disposition report, the Agency recommended Nathan be adjudicated a dependent and the parents receive reunification services and supervised visits.[4] Nathan told a social worker he did not understand why he had been removed from Cassandra, but said his foster placement was going "great." Nathan said Cassandra was "part of the 'FBI' and she was doing an investigation on these men and that part is private." Nathan's confirmatory drug test results were positive for amphetamine and negative for methamphetamine.

Cassandra told the social worker Nathan tested positive for amphetamine because he takes medication for attention deficit hyperactivity disorder (ADHD). Cassandra insisted Nathan be placed with her mother, but refused to provide her contact information to the social worker. During a subsequent phone call, Cassandra told the social worker the maternal grandmother was also on the call, but the social worker did not hear anyone else on the phone. Cassandra told the social worker she was recording and documenting everything and she felt the social worker was violating her rights by asking questions about her mental health.

Cassandra agreed to submit to a drug test. However, when she arrived at the Agency's contracted lab, she presented a "waiver" she was given by "her people" to assure her constitutional rights were not violated. Cassandra wanted to provide a drug sample to her people, as well, but would not explain to the social worker who her people were. Cassandra made statements about working on an insurance fraud case with the

_____

4       Nathan's father, Brent H., is not a party to this appeal; we mention him only as relevant to Cassandra's appeal.

5

federal government and about suing the drug testing lab and the Agency. She also stated she would submit to a drug test with her physician, as she did on a regular basis for her medication.

Cassandra informed the social worker she was attending Narcotics Anonymous meetings, not because she needed them but because she had time on her hands. The social worker advised her to obtain proof of meeting attendance. Cassandra stated she performed a drug test on the day prior and offered to drop off the results at the social worker's office, but would have to do so another day because she was low on gas and would have to wait until her "money comes in." She claimed to have a "conflict of [i]nterest" with the Agency's drug testing contractor "and is doing a private investigation on fraud and has a case on them."

The social worker scheduled a team decision meeting (TDM) and arranged to meet Cassandra in advance. Cassandra provided the social worker with a negative drug test from "Drug Testing Network." The Agency's substance abuse specialist referred Cassandra to a substance abuse program, but Cassandra canceled because she did not feel it was necessary. She also told the social worker she could not speak to the social worker about many things because Cassandra was a "protective witness for the Department of Justice in my own investigation." Cassandra's explanation to the social worker was convoluted and the social worker had difficulty following her. When the social worker informed Cassandra that Brent would be participating in the TDM by phone, she objected on the basis of a restraining order against the father. The social worker explained the

6

restraining order allowed contact with Brent "in a therapeutic setting," and told Cassandra the TDM facilitator would address the issue.

The TDM facilitator reported Cassandra displayed tangential thinking and made statements about filing an injunction. Cassandra discussed her distrust of the social worker, the federal government, and the court system and asked to postpone the TDM until she could file an injunction. Due to Cassandra's request, the TDM was postponed indefinitely.

Nathan's school principal told a social worker she was aware of the family's circumstances and stated Nathan's school attendance was "decent considering their situation." The principal observed that although Nathan was always clean and cared for, he was "extremely thin." In a letter to the school, Cassandra explained Nathan's ADHD medication affected his appetite and asked that school staff monitor his eating. Cassandra was open to receiving services from the school, but the principal suspected she was on drugs because of her "affect, her actions, lack of focus, kind of overly impulsive, eyes looking all around, not typical behaviors."

A social worker also interviewed Cassandra's friend, Patricia M., who was in a relationship with Cassandra's friend Jeff. Patricia had known Cassandra for three years and had observed her strange behavior and changed appearance; Cassandra had become very slim and did not make eye contact. Patricia reported Cassandra stayed at Jeff's house at least once, and also lived in a car, storage units, and occasionally hotels. Cassandra stayed at Jeff's house the night of June 3—the day after her arrest—and Patricia reported finding drug paraphernalia the next day in the room Cassandra had used.

7

Patricia also reported Cassandra stole Jeff's wallet on June 21, which Jeff confirmed by viewing security camera footage from a business at which Cassandra used one of his credit cards.

Throughout July 2014, Cassandra sent bizarre text messages and e-mails to the social worker and Nathan's foster father, Daniel. In one text message to social worker Flor Beyer, Cassandra wrote: "You should be requiring [Brent's family] to follow the authentic and true legal restraining order Ms. Beyer because my people have the legal right to record, copy, monitor, [tailgate], follow, stalk, record phone calls, send messages from and through others, question, charge, and arrest anyone doing business for[,] spying for, working for, lying for, buying for, signing for, trying for, or dying for, through, with, without, Brent H. [¶] Yours Don't. [¶] Seems to me the entire class action suit screwed too many auto bond caps throughout European Zimmers and Walt fricken Disney."

In an e-mail to foster father Daniel, Cassandra wrote: "Dear Judge O'Neal,[5] How is my child? I thought you might like to know that we found two like kidnappings in the same year, with the same pictures- however so resembling someone like yourself. Please forgive me if I am mistaken in identity, but the truth is, Jeff D[.] should never have been the emergency contact in my file, and I want to extend my deepest gratitude for saving my son form [*sic*] a Geico insurance claim scam worked by Alfredo R[.] and the co-ops tending bar down south of the border gram, (who have also been taking young white children over to Mexico and selling them for life on the stick)[.] [¶] . . . . Can you

---

5       Daniel's last name is not O'Neal.

please tell me how much foster judges get paid to care for children not of their own clan or fiduciary make up? My personal experience had been that a willing heart makes a very big commission and never needs to collect well fare [*sic*] for the aspect is near lot hoe [*sic*] many kids did you say you've been fostering? Have you had your head checked recently?[] Hmmmmm . . . . Anyhow, I will be very thankful when you deliver my son Nathan . . . back to me with prejudice, or without missing ripples round his head and brain stem. I am quite certain you know exactly what I mean when I say that. [¶] Also I ask gently and politely, Do NOT EVER, never, ever, ever tell me I cannot see my child[.] You know who I am, so please be square and fair, for the time on the clock for tourist and Zoo season, is wiping out everyone else's bank account this time, and I'm sure One of the two of you will like to keep your bench in my court, no? Have a likely day sir . . . ."

In an e-mail to Nathan, Cassandra wrote she "sent the Men in Black to protect you and your foster KIN while mommie's investigating situation with a bunch of No good criminologists!"

On July 8, Nathan's foster mother, R., related to the Agency that Nathan's doctor recommended Nathan begin therapy. Nathan lacked social skills, exhibited by his biting people at school and defecating in the school urinal.

On July 21, Daniel dropped off Nathan 10 minutes before school began and watched him walk through the gate and onto school grounds. After Daniel left and Nathan lined up for class, Cassandra walked up to him, grabbed him by the hand, and started walking off the school grounds. The principal, a teacher, a clerk, a custodian, and a parent all followed Cassandra and tried to stop her without touching her. Cassandra

9

responded, "No, no, I have a restraining order against the school." Police and the district attorney's office were notified. The juvenile court issued a pickup-and-detain order for Nathan and a bench warrant for Cassandra's arrest.

Police located Cassandra and Nathan four days after she took him. Police arrested Cassandra and took Nathan to PCC until his foster family picked him up. Nathan reported he and Cassandra slept in her car, went to the beach, and got sunburned. Nathan could only remember eating a cookie and ice cream. He earned the cookie by sweeping the floor of a cafe; he earned the ice cream as a reward from Cassandra for successful panhandling. Regarding the latter, he held a sign that said "Join the dark side $1." When asked how one would join the dark side, Nathan said he would tell kids to "pull people's pants down." Cassandra sat in a chair nearby "laughing really hard" as Nathan panhandled.

Cassandra was unremorseful. In an e-mail to Daniel, she wrote: "By the way, we had a lot of fun- I do not regret what I did at all- it was worth the three days I spent in Auschwitz with that one missing Jewish guy-...ooops- sorry about that- it was only a comic relief!!!" In another, she wrote: "Nathan was briefed clearly on what to look for and knew before the arrest that I would be arrested for a short spell. He should be eating better now- take him and the kids to one of the whole foods markets . . . and allow him to browse the free samples in every green isle [*sic*] also allow him to offer sweeping the floor for cookies, he will show you how it's done, heh."

In an e-mail to Nathan, Cassandra instructed him to tell Daniel "how you got to sweep the coffee shop and got paid. Oh yea, tell him how much the dark side costs and

10

how many people paid a dollar for the first free lesson in how to 'pull up-pull down- pull in –pull out'!!  But only share that with Dan, no one else."

Cassandra tried to keep her purportedly new contact information from the Agency.[6]  In one e-mail to Daniel, she wrote:  "You and you only, may [e-mail] me at this address.  [Social worker] Beyer has the old one, and I would like to keep it that way.  I have a secondary new cell device in which you and I will communicate with in regards to Nathan.  Please keep it confidential- Beyer can play with the old one."  In another she asked, "please do not relay this information to Beyer as I have an order of protection and privacy from any of those agencies, through the department of Justice.[7]  It is imperative you and the investigator on this case only share my info with one another and no one else."  And in another she cautioned, "You should be ware [*sic*] though however that it is a serious violation of my constitutional rights and personal protections, to compromise or share the same, any information where a 'request to keep such personal information and addresses, telephone numbers, and contact information PRIVATE', if stated by the subject (that being me) to be kept confidential."

Cassandra's e-mails to Daniel also expressed paranoid concerns.  In one, she stated "the agency you're doing business or work with owes me and my kids a shit load of hard earned money [in] stocks, bonds, energy sales, and land acquisitions which were stolen by said agency . . . .  Let me remind you and I have also reminded Beyer the same I do

---

[6]     One address Cassandra provided turned out to be a tire store.

[7]     No such order appears in the appellate record.

11

work for the 'Big Man' the agency above all law and ordinance whether or not it seems real to you and whatever you or your accomplices violate in the way of my constitutional arena, shall also be judge[d] by a quite different court. You sir have been guarding my son by way of enemy lines- my enemy lines and I am giving you the benefit of a doubt and trusting you will make a better decision who to be loyal."

The Agency requested Cassandra be limited to telephonic contact with Nathan. Nathan's attorney requested a temporary restraining order preventing Cassandra from having any contact outside of specific supervised visits arranged with the social worker. The Agency opposed supervised visits because it did not have staff who could restrain Cassandra from removing Nathan from a visit. Expressing concern about Cassandra's mental health and judgment, the juvenile court issued a restraining order that limited Cassandra to supervised telephonic contact with Nathan.

At a special hearing on August 15, the juvenile court, with Cassandra's consent, appointed a guardian ad litem on her behalf. The court also ordered the foster parents temporarily be designated the holders of Nathan's educational rights.

The Agency filed an amended petition adding the allegation that there was substantial risk Nathan would suffer serious physical harm or illness due to Cassandra's inability to provide regular care for him due to her mental illness. The petition cited as examples Cassandra's taking Nathan from school and "[e-mails] and text messages that are not lucid and demonstrate tangential and paranoid thoughts." The juvenile court struck the original allegation about Nathan's presumptive positive drug test based on the Agency's confirmation that his ADHD medication would have triggered a false positive.

12

Cassandra visited telephonically with Nathan three times during the two weeks leading up to the contested hearing. On several occasions, Daniel had to intervene and redirect Cassandra, who frequently discussed the dependency case with Nathan. During one call, she told him, "I'm coming to get you soon." During another, she told Nathan she was working hard to get him home soon and was doing her " 'paperwork' and working on her 'investigations.' "

On August 26, the juvenile court conducted a trial on the documents.[8] The court made a true finding on the petition by clear and convincing evidence. It declared Nathan to be a dependent, removed custody from Cassandra, and found it would be detrimental to place him with his father. The court placed Nathan in licensed foster care and ordered reunification services for both parents. It also extended the temporary restraining order until the six-month review date, ordered psychological and psychiatric evaluations for Cassandra, and transferred Nathan's educational rights to the foster parents.

Cassandra timely appealed.

DISCUSSION

I.

*SUBSTANTIAL EVIDENCE SUPPORTS THE JURISDICTIONAL FINDINGS*

A.      *Legal Framework*

At the jurisdictional hearing, the juvenile court determines whether the child is described by one or more subdivisions of section 300. (*In re J.K.* (2009) 174 Cal.App.4th

---

[8]     The court admitted the Agency's detention report, jurisdiction and disposition report, and addenda thereto.

13

1426, 1432 (*J.K.*).)  Under section 300, subdivision (b), the Agency must show by a preponderance of the evidence that the parent's neglectful conduct has caused the child to suffer serious physical harm or illness, or creates a substantial risk that the child will suffer such harm or illness.  (*Ibid.*; § 355, subd. (a).)  " 'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 244, 243.)

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings." (*J.K.*, *supra*, 174 Cal.App.4th at p. 1433.)  "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)  "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*Ibid.*)

B.     *Analysis*

We conclude the record, viewed as a whole, contains substantial evidence in support of the juvenile court's jurisdictional findings that Cassandra's substance abuse and mental illness subjected Nathan to a substantial risk of serious physical harm or illness. Beginning with the car accident that prompted this dependency proceeding, Nathan suffered serious physical harm—a bruised lung.  According to Nathan, Cassandra left him in a locked car while she and Trevor attended a party until 5:00 a.m.  Trevor then drove on the wrong side of the road, crashed into a tree, and fled the scene.  Cassandra

14

claimed to be riding in the back of the car, though paramedics reported there was not enough room for a passenger. A hospital social worker suspected Cassandra was under the influence of drugs. Trevor later admitted to a social worker that he occasionally smoked marijuana, but Cassandra advised him not to answer the social worker's questions about the accident. This evidence supports a reasonable inference that Cassandra and Trevor were under the influence of drugs at the time of the accident and that Cassandra allowed Nathan to ride in a car driven by Trevor, which resulted in Nathan's hospitalization.

There is additional evidence that Cassandra's substance abuse impaired her ability to adequately supervise and protect Nathan, subjecting him to substantial risk of additional serious injury or illness. Cassandra admitted to a history of methamphetamine use, but denied doing so recently. However, the record supports the inference that she was under the influence of drugs during the May 25 accident that injured Nathan; during her June 2 arrest for being under the influence, which left Nathan unattended at school and resulted in his transport to PCC; during her stay with Jeff on the night of June 3; and at various times when she was observed by Nathan's school principal. Cassandra also admitted to having used drugs in the past to self-medicate her mental health issues, which, as discussed below, remain unabated.

Despite this evidence of her substance abuse, Cassandra refused to cooperate with the Agency's requested drug screening. On the first request, she refused to use the Agency's contracted lab. On a later request, she told the social worker if she wanted "fluid from my body you need to give me a warrant because you are doing everything

15

illegally," adding, "I want you to drug test and everyone too."  Cassandra also canceled her appointment with the substance abuse treatment program the Agency referred her to.

Cassandra urges us to apply the rigid, clinical definition of substance abuse applied in *In re Drake M*. (2012) 211 Cal.App.4th 754, 766, which defined substance abuse as "evidence sufficient to (1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the DSM-IV-TR [The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000)]."  We decline to do so.  The *Drake* court grappled with how to define substance abuse in the context of recommended medical marijuana use by a father who was candid with the agency about his use and was willing to undergo drug testing.  (*Id*. at p. 760.)  No similar considerations are present here, where Cassandra used illegal methamphetamine, concealed her use from the Agency, and resisted drug testing.  Because *Drake's* definition of substance abuse "is not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court" (*In re Christopher R*. (2014) 225 Cal.App.4th 1210, 1218), we decline to apply it in such a factually distinct scenario.  Under the circumstances here, substantial evidence supports the finding that Cassandra was a substance abuser.  (See, e.g., *id*. at pp. 1218-1219 ["we have no doubt [the mother's] use of cocaine while in the final stage of her pregnancy, combined with her admitted use of the drug in the past and her failure to consistently test or enroll in a drug abuse program, justified the juvenile court's exercise of dependency jurisdiction over her children"].)

16

Substantial evidence also supports the finding that Cassandra's mental illness subjected Nathan to substantial risk of serious physical injury or illness. The record is replete with examples of communications demonstrating Cassandra's incoherent, tangential, and paranoid thoughts. She wrote often about the "investigations" with which she was helping the federal government, including the FBI, and she accused the Agency of stealing her "stocks, bonds, energy sales, and land acquisitions." Cassandra's e-mail to Daniel about the "ripples round [Nathan's] head and brain stem" demonstrates her delusions related to Nathan's physical condition.

Cassandra taking Nathan from his school constitutes further substantial evidence in support of the juvenile court's jurisdictional findings. Although Cassandra attempts to minimize the event by arguing it was the last day of the school year, the troubling aspect of her conduct is that she violated the juvenile court's visitation order. Further, during her four days away with Nathan, Cassandra apparently fed him only ice cream and cookies, which he had to earn by sweeping a cafe and by selling "dark side" lessons. Making matters worse, Cassandra—in her own words—did "not regret what [she] did at all."

Cassandra's parenting took its toll on Nathan. Apart from suffering a bruised lung, Nathan lacked social skills, required therapy, and was extremely thin.

Whether on the basis of Cassandra's substance abuse or mental illness, or both, the juvenile court's jurisdictional findings are supported by substantial evidence. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence"].)

17

## II.

### *SUBSTANTIAL EVIDENCE SUPPORTS THE DISPOSITIONAL ORDER*

A.    *Legal Framework*

Under section 361, subdivision (c)(1), custody of a dependent child may not be removed from his or her parents unless the court finds there is clear and convincing evidence that there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child. (*Ibid.*; *J.K.*, *supra*, 174 Cal.App.4th at p. 1433.)  "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136.)  "In this regard, the court may consider the parent's past conduct as well as present circumstances."  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re T.V.*, *supra*, 217 Cal.App.4th at p. 133 ["A parent's past conduct is a good predictor of future behavior."].)  "Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order."  (*In re Cole C.*, at p. 918.)

We review the juvenile court's dispositional order for substantial evidence.  (*J.K.*, *supra*, 174 Cal.App.4th at p. 1433.)  As we have explained, " 'on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong."  [Citation.]' "  (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.)

B.      *Analysis*

We conclude the same evidence that supports the juvenile court's jurisdictional findings—which the juvenile court made by clear and convincing evidence even though it was only required to do so by a preponderance—is also sufficient to support the dispositional findings that there is or would be a substantial risk of harm to Nathan's physical health or safety if not removed from Cassandra's custody.  (§ 361, subd. (c)(1).)  Moreover, Cassandra's violation of the court order governing her visitation rights further supports the conclusion removal was appropriate.

Cassandra relies heavily on *In re Ashly F*. (2014) 225 Cal.App.4th 803 (*Ashly F*.) to support her argument that the juvenile court did not satisfy its duty to consider alternatives to removal.  *Ashly F*. is distinguishable.  In that case, the mother physically abused her children and, after the detention hearing, moved out of the family home where the husband remained.  (*Id.* at pp. 806-807.)  The disposition report by the Department of Children and Family Services (DCFS) perfunctorily stated there were no " 'reasonable means' " by which the children could be protected without removal and that " '[r]easonable efforts' " were made to avoid removal.  (*Ashly F., at* p. 808.)  The report did not elaborate other than to say the family was provided with reunification services.  (*Ibid.*)  The report "did not state that DCFS had conducted the prerelease investigation report on Father as it was directed to do at the detention hearing."  (*Ibid.*)  The court made no inquiry, and in its order parroted DCFS's assertion that DCFS made reasonable efforts to avoid removal.  (*Ibid.*)

19

The appellate court concluded "DCFS and the court committed prejudicial errors in failing to follow the procedures mandated by the Legislature and the Judicial Council for determining whether the children needed to be removed from their home." (*Ashly F.*, *supra,* 225 Cal.App.4th at p. 810.) *Ashly F.* explains: "By the time of the hearing Father had already completed a parenting class. Furthermore, 'reasonable means' of protecting the children that should at least have been considered include unannounced visits by DCFS, public health nursing services, in-home counseling services and removing Mother from the home." (*Ibid.*)

*Ashly F.* is distinguishable for several reasons. First, unlike the DCFS in *Ashly F.*, the Agency here dedicated a section of its jurisdiction/disposition report to a discussion of the "[r]easonable [e]fforts" it undertook to avoid removal. And although Cassandra correctly observes several of the entries—like ordering Nathan's birth certificate, placing him in foster care, and taking him to school every day—are not relevant to whether alternatives to removal existed, others—like addressing Cassandra's substance abuse, scheduling a TDM, and providing her with community resources—are relevant to the Agency's efforts to help Cassandra address the substance abuse and mental health issues that precipitated this dependency case. Additionally, other sections of the Agency's reports convey the Agency's recommendation that Cassandra "attend[] therapy, submit to random drug testing, meet with the Substance Abuse Specialist, participate in a drug treatment program and get a psychological evaluation." Cassandra's refusal to participate in any of these activities belies her claim to the social worker that she was "doing everything and more than the Agency was requiring of her."

20

Second, the juvenile court here, unlike in *Ashly F.*, offered a factual basis for its removal order beyond merely parroting conclusory recommendations. In addition to citing the factual bases set forth in the Agency's reports,[9] the juvenile court addressed Cassandra as follows: "[W]e want to see you get some counseling, some medication to help you focus better on reality and on taking care of Nathan. The goal of this court is to help children be with their parents, and that's what everyone is here for. [¶] . . . [¶] We have concerns. You are focused on a lot of investigations. You're focused on -- you're focused on a lot of things that are troubling you. And I know they're upsetting to you. [¶] We want to get you some help so that maybe you can focus better on taking care of Nathan and day-to-day events and get you some help in sorting out what you need to focus on and what you don't need to focus on."

Finally, the *Ashly F.* juvenile court had the option of removing the offending parent because both parents lived in the same home; that option did not exist here because the juvenile court found it would be detrimental to place Nathan with his father.

On the record before us, we conclude substantial evidence supports the juvenile court's dispositional order.

---

9    The juvenile court stated: "In terms of the evidentiary basis for the court's ruling, I think it is well set out in the reports that were submitted, both as to jurisdiction and disposition."

21

## III.

*THE JUVENILE COURT DID NOT ABUSE ITS DISCRETION REGARDING NATHAN'S EDUCATIONAL RIGHTS*

A.    *Legal Framework*

"Parents have a constitutionally protected liberty interest in directing their children's education.  [Citations.]  However, when a child is a dependent child, a court may limit a parent's ability to make educational decisions on the child's behalf by appointing a responsible adult to make educational decisions.  [Citations.]"  (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276 (*R.W.*), citing § 361, subd. (a) & Cal. Rules of Court, rule 5.650(a).)  "A court-imposed limitation on a parent's educational rights 'may not exceed those necessary to protect the child.' "  (*R.W.*, at p. 1276, quoting § 361, subd. (a); *In re Samuel G.* (2009) 174 Cal.App.4th 502, 510 ["All educational decisions must be based on the best interests of the child."].)

"We review the juvenile court's order limiting parents' educational rights under an abuse of discretion standard [citation], bearing in mind '[t]he focus of dependency proceedings is on the child, not the parent' [citation]."  (*R.W.*, *supra,* 172 Cal.App.4th at p. 1277.)  A proper exercise of discretion is " 'neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice.  [Citation.]' "  (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.)  The standard "asks in substance whether the ruling in

22

question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162.)

B.    *Analysis*

The juvenile court's order placing Nathan's educational rights with his foster parents did not fall outside the bounds of reason. As discussed above, Cassandra suffered from substance abuse and mental health issues and behaved erratically and irrationally. In the context of Nathan's education, those behaviors manifested themselves when Cassandra took him from school in violation of the juvenile court's visitation order approximately one month before the jurisdiction and disposition hearing. Nathan was also having social adjustment issues at school. Under these circumstances, the juvenile court did not abuse its discretion by assigning Nathan's educational rights to his foster parents, particularly where the juvenile court ordered the Agency to keep Cassandra informed of developments in Nathan's education and, in the Agency's discretion, to involve her in school meetings, if appropriate. The juvenile court's limitations on Cassandra's educational rights, thus, did " 'not exceed those necessary to protect the child.' " (*R.W.*, *supra*, 172 Cal.App.4th at p. 1276, citing § 361, subd. (a).)

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

NARES, J.